The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and His Honorable Court. Good morning. The first argued case this morning is No. 20-1475, Bio-Rad Laboratories, Inc. v. International Trade Commission. Mr. Cannon, please proceed. May it please the Court, Brian Cannon for Bio-Rad. Your Honors, this case involved three patents owned by Bio-Rad, all directed to precisely engineered devices for forming microfluidic-sized droplets in a background fluid. These devices are sometimes called chips or cartridges. They have wells and tiny channels, and these channels are about the size of a human hair. And the idea of these patents is you put fluid under pressure to create tiny aqueous droplets in oil. And these droplets are tremendously useful in a variety of applications. What Bio-Rad perfected in these three patents was making uniform and consistent droplets on the chips. And there are two sets of products at issue from the ITC investigation below, and these are imported and sold by Tenex. The first are the commercial chips that the ITC found to be infringed, and they are not the subject of Bio-Rad's appeal. The second set of chips are chips that Tenex uses internally to make droplets as part of its manufacturing process. And these chips, these are the ones that are the subject of Bio-Rad's appeal. They are called the Chip GB. And even though the ITC found that Tenex's commercial chips infringed, it found no infringement for the Chip GB, and Bio-Rad contends this was an error of law by the ITC below, and that is the subject of our appeal. To get directly to the issue, is the question, does everything come down to the definition of sample? Is it there are all sorts of complicated issues that are mentioned by all parties in their briefs, but is that what we should be focusing on? Yes, Your Honor, exactly. And the issue is the definition of sample, because these patents, or this patent, this single patent, the 664 patent, it requires a sample well and one of the channels to carry sample-containing fluid. And it's this sample-containing fluid that becomes the droplet in the background oil. And the parties below had an agreed-upon claim construction for sample. And it's very straightforward, and the claim construction is, for sample, a compound, composition, and or mixture of interest from any suitable source. And that can be found at Appendix Site 704, which is the claim construction order. And that is a very deliberately broad definition of sample. It just has to be basically anything of interest from any suitable source, and that is to contrast it with the background fluid, which is the oil in which the droplets are formed. And the theory is that it's not a sample of interest because it's not going to be analyzed, right? Well, what the ITC found, what the ALJ found, which was – That's what the ITC found, right? Yes. The ITC found because the fluid used in 10X's manufacturing process was not of interest to an end-user customer and was not a biological sample, it was therefore not a sample for purposes of this patent. However, the claim construction does not require the sample to be of interest to an end-user customer doing an experiment in a biological lab. The patent is broader than that, and the claim construction is broader than that. And in fact, the specification is broader than that as well. So I think Your Honor has nailed the exact issue, which is the ITC imported into the claim construction, into the claims a requirement that a sample be of interest, not just generally of interest, but of interest to a specific person, the end-user customer in a biological sciences lab. I think you have a hard time saying that the claim construction is definitive because it's not entirely clear. And so what we have is a situation in which the ITC has sort of interpreted its own claim construction to require that the sample be of interest for purposes of analysis. And the question is whether that's correct or not correct in the light of the patent and the specification. Your Honor, I agree in part with that, but I also disagree respectfully because the claim construction requires the sample material to be of interest. It doesn't specify of interest to whom or in what context. As long as that aqueous fluid is the material of interest to contrast with the background fluid, because remember, it's the aqueous fluid that forms the droplets, and it's the background fluid, the oil, that just serves as the background. That's not of interest. It's the immiscible fluid that is contrasted with the aqueous fluid. So the concept in these patents is you have two different types of fluids going through these channels. One is aqueous, one is oil. And so through the intersection of the channels, droplets of aqueous fluid are formed, and the sample fluid is the aqueous fluid, and it just has to be of interest. So I would say that of interest doesn't specify of interest to whom. It just has to be the subject matter of what's getting run, what becomes the droplet. But to get to your second point, if you do actually look at the specification, because the claim construction is derived directly from the specification. That's Appendix A454, which is the 664 patent. It comes from Column A, Lines 36 to 38. The agreed-upon claim construction is simply how the word sample is defined in the specification, and the examples that are given are tremendously broad of what can constitute a sample. And I would argue that even though examples in a specification are not limiting, just the breadth of the examples of what a sample could be demonstrate that the term sample, or the term of interest, which is what the sample is supposed to be, can be anything. It can be foodstuffs, weapons components, biodefense samples. There's all kinds of material, including biological material, that could be the sample. Well, this is Doug Flory. Have you ever found a case where a claim has been interpreted or found infringed or not because of the words of interest? Intention usually isn't part of the interpretation of claims. Of interest, are there any cases construing of interest? We don't have a case that focuses on that phrase that we have briefed, but I think of interest is partly of who is interested in this material, but it's also to contrast the fluid that's in the droplets with the fluid that is in the background, the oil fluid that actually creates the droplets. So we don't have a case that says, here is what of interest means, but I think if you look at this claim and you look at the patent, it's directed towards creating these droplets within a background fluid and doesn't specify who actually has to be interested in the sample. Someone has to be interested in it, and in this case, 10X, as the manufacturer using these chips, 10X is extremely interested in the sample, in the monomer solution that goes into these chips. The end-user customer may or may not be interested, but 10X, as the manufacturer of these droplets for its own internal purposes, is extremely interested, and as we laid out in the brief, 10X does extensive quality control on the material that goes into these droplets, and it's of great interest to 10X to have the monomer solution. What about column 14 of the patent, line 43, which defines sample containing as meaning the sample material to be analyzed? Doesn't that suggest that the sample is to be analyzed for purposes of determining its content, not as simply as part of overall quality control? Well, that is certainly one example of a sample-containing droplet, and it is true that when scientists in labs use these droplets, one of the applications is to analyze and analyze, such as a cell or a sequence of DNA. Isn't this part of the specification inconsistent with the argument you're making? I don't believe so, Your Honor. I think this is one example of a sample that could be used. I mean, certainly a sample could be of interest to a scientist and certainly could be analyzed. The claim construction is not- What's described here is not what you're talking about, right? If you took this as a definition of what a sample was, you would lose, right? I don't believe that we would lose if this example is the definition of sample, but actually it's not. Why not? Because this example is directed towards analyte, and I'm looking at column 14, line 45 to 46, contains sample material to be analyzed for the presence of one or more target molecules, and that is not what is being done with these ChIP-GBs. If the definition of sample was to look for one or more target molecules to be analyzed, that is not the application that's being done here with these ChIPs. Your Honor, my time has expired. Was there anything else that you wish to ask me about this? Let's see if we've completed the exploration, especially the point that you were just making, but just to make clear that we understand what the issues are, you're telling us that using the word sample at that point in column 14 was discussing- I'll say discussing the use of the ChIPs or AUs, but not limiting the overall structure and design? That's exactly correct, Your Honor. Okay. Any questions? Any more questions at this point for Mr. Cannon? No. Okay. Mr. Groombridge, are you next? I am, Your Honor. Okay. Please proceed. Thank you. This is Nicholas Groombridge for 10X. May it please the Court. I'd like to pick up with the discussion of the ChIP-GB and the claim construction issue here, and we do agree with Your Honor, Judge Newman, that this does come down to the definition of sample, and it also implicates what does of interest mean, and we also agree with what Judge Dyke said, pointing to column 14, lines 43 to 50. That's an instance of the use of sample, and it certainly in that text appears to be definitional, but the entire set of definitions that appear at columns 9 through 13 make clear in this case that the sample is something to be analyzed, that it may or may not contain an analyte, which is something one is looking for, for example, a pathogen molecule, and that a reagent is something different, and the term sample is carefully constructed here quite elaborately to be the thing that is to be analyzed, and in that context, then the ChIP-GB is not used in such a fashion that it has no sample well because it's not being used to analyze a sample. It doesn't have the other features that are defined in the patent by reference to the term sample. But is there a distinction in the claim that it must be a reagent which acts on the sample? I think, Your Honor, that what's in the claim is the use of the word sample, and that the patentee here chose to define the architecture by reference, the features here by reference to what would be in them, and that therefore leads us to what is a sample, and the patent is crystal clear that a sample is something that's going to be analyzed, and under that reading, then there can be no infringement because this ChIP isn't used with samples, and so we don't think that it implicates a question of intent to Judge Laurie's question here. I think that it's more the objective facts of what it's actually used for, but there certainly are some issues around the decision by the patent drafter here to define physical features by reference to what would be in them, and so that really sets out our position as far as the ChIP-GB is concerned. I would just say that we disagree that there was any change to the claim construction. We certainly disagree that the commission read in either a requirement that something be of interest to an end user or that it be biological. It merely cited those as examples as testimony when, in applying the claim construction, it reached the second stage of infringement analysis, the fact stage. Well, there's nothing wrong in any event with the commission elaborating on a claim construction when it addresses infringement, right? Absolutely, Judge Dyke, and to your honest point, we do think that this is one of those situations where there's an express definition which the parties all agreed to, which includes the language of interest. We then got to the point of, well, what exactly does that mean, and I think it's not wrong to say the ITC interpreted its own claim construction, but it did that entirely correctly by reference to these portions of the specification that are definitional and said the specification tells us what a sample is and juxtaposes it with a reagent, and this chip is not being used with anything that counts as a sample as defined in the patent. And with that, unless the court has further questions on this issue, I would like to move on to 10X's appeal and to the question of the proper construction of droplet generation region here. And specifically, I'd like to address, first of all, the construction, as we see, in terms of what we think was wrong in pure claim construction, and secondly, the issue around Assay-Neustoppel and whether the prior art was or was not considered here. And so, with respect to the construction of droplet generation region, I think, first of all, I would like to touch on waiver, simply because it has been asserted very vigorously by both Bio-Rad and the commission that there was a waiver here, and we, of course, disagree with that. And I think it might be useful just to lay out what happened. To be clear, the construction that 10X is advocating in this court is the same construction that it advocated before the commission, and that construction never changed. That construction was set out originally in the joint claim chart. It was then incorporated in 10X's briefing on claim construction, and it was the subject of, after the initial determination, it was the subject of a request for review by the commission. The waiver argument here is based on a sentence in, or the conclusion of waiver, and then the arguments that are now presented to this court, based on a sentence in 10X's brief, at appendix 1088. But if we look just seven pages earlier in that same section of the brief, the proposed construction is laid out there. It's the construction that has never changed, and that is what we are advocating, and thus we, in our view, there was never any departure from that, and thus these issues of waiver simply don't arise. With respect to that, the construction that we advocate here is based on the fact that these patents define the physical features by virtue of what is in them, and when they are talking about features that are defined as sample-containing, in our view, what that means in view of the specifications is that the channel, the sample channel, the sample-containing channel that arrives at the intersection where the droplets are to be formed, is defined as a channel that is conveying fluid, and it's the same fluid that left the sample well. So is the theory here that because the sample has been encapsulated by the time it reaches the oil channel, that it doesn't comply with the claim limitation? Is that the idea? The theory, Your Honor, is that what reaches the point at which droplets are generated is a different fluid, because it has been merged with a second fluid. So what is arriving there is not... This is a comprising claim, so what's wrong with that? What's wrong with the fact that there's a second... It's a comprising claim, but that doesn't mean that the term sample-containing can be redefined. But you're saying it doesn't contain any of the analyte? You say it's a different fluid? It's a different fluid, Your Honor, because what has happened in the design that 10X has, it is very carefully engineered to mix two aqueous phases prior to their arriving at the point at which droplets are generated. And the reason for that... But does it contain any of the material to be analyzed?  But why isn't it a sample? Why isn't it sample-containing? Because in our view, Your Honor, the term sample-containing in these patents is defined to mean that which is in the sample well. And it certainly could be mixed with other reagents before it's put into the sample well. But these patents are not talking about any system in which, on the chip, after the sample-containing material leaves the well, it is admixed further before it reaches the channel, the intersection at which the droplets are generated. Well, then it doesn't matter, you say. Well, I think we say it does matter because the claim terms that define the sample-containing and a fair reading of the patents is that that's what is the material that's in the sample well. And so that what arrives at the intersection must be the same material that left the sample well. And in our case, it is not. Well, but you see what the trouble is. Here, apparently, the same procedures are being conducted as are taught in the patent. But we have this word sample, and we're doing this very elaborate lexicographic or whatever definition of sample removed from, I'll say, the reality of what's in the specification. Can you put that back on track from your viewpoint? Well, I will certainly try, Your Honor. So what we're focusing on is what is the meaning of sample and sample-containing in these patents. And in our view, what was decided below was that it can be admixed on the chip simply because sample-containing does not exclude that. We think that that's inconsistent with the way the term is used. And perhaps in terms of, I'm not sure that this is in the briefing, but the only place that we find in any of these patents that refers to such an admixture is in the 160 patent. Not at issue in this appeal. At the bottom of Column 73, where it talks about such a mixture, but it uses a different term. It doesn't call it sample-containing fluid. It calls it sample-reagent mixture fluid. And in our view, that's indicative of the fact here that what the patents are talking about when they reference sample-containing fluid is the material that left the sample well. It can be admixed with other things before it's put in the sample well, but it can't be admixed. But why isn't it a sample-containing fluid even if it's mixed with something else? I'm not quite following that. Your Honor, because the only disclosure in these patents and the use of the term sample-containing is saying that's what's in the sample well. That, for example, the very language at Column 14, Lines 43 to 50, we think a fair reading of that is that you can put other reagents. For example, you could put PCR primers and enzymes and such like with the sample and then put it in the sample well. That liquid which is in the sample well is certainly sample-containing, even though it has had other things added to it. What the patents are not allowing here is that mixture on the chip, so that when the liquid leaves the sample well, it's admixed with something before it arrives at the point at which droplets are generated. You said the patents are not allowing that? Perhaps I didn't read them carefully enough. Is that explicitly prohibited in the specification? I think it's – my time is up, Your Honor. Yes, please respond. Certainly continue. There's no words that I could point to that say we hereby exclude this, but I think that the usage of the term sample and sample-containing are invariably described with respect to the material that was put into the sample well and that the physical features are described by reference to what's in them. It must be pure analyte with nothing else? Not pure analyte, not in the least, but it must be what was placed in the sample well. That could include other things, but what it's not allowing, because this isn't disclosed or described or enabled, and it's not how the terms are used, is an architecture in which admixture takes place on the chip. That is not something that was the subject of these patents, and that's the core of it. I will – my time having run out, unless there are other questions. I have one more question, Mr. Kronbrich, before you sit down, and that has to do with inducement and contributory infringement. Certainly. If we were to reject your position on contributory infringement, does it make any difference whether you're right about induced infringement? I'm thinking about it. I think, Your Honor, I mean, there is an intent requirement for both induced infringement and contributory infringement, and it is under the COML. Certainly, there is an intent requirement. Whether the intent requirement is the same may be something of a vexed question, That's not really answering my question. My question is, suppose we say you're right on induced but wrong on contributory. Does it make any difference that you were right on induced? I think it might, Your Honor. I'd have to sort of tease that through, but because we're dealing with importation and what happens with the things after they're imported and how they might subsequently be used, I think it might. Okay. Okay. All right. Now you have some rebuttal time saved. All right. Let's hear from the Commission. Mr. Trout. Thank you, Your Honor. Just before you get on to other things, could you just answer that same question? If we hold that the Commission was right on contributory infringement but wrong on induced infringement, does it make any difference? Did you ask that question the same way before? I thought before you asked if they were right on induced but wrong on contrib. So if the Commission is wrong on contrib, then it wouldn't make any difference. No, right on contrib. Right on contrib. If the Commission is right on contrib, then it would be right on induced as well. No, no. That's not the question I'm asking. I'm asking in terms of practical effect. A practical? No, there wouldn't be a practical effect difference, no. Okay. There would still be a violation of Section 337. Okay. Okay. So I was going to start with a BioRADS appeal and issue about sample, unless the Court would like me to proceed otherwise. Well, no need to repeat the arguments we've already heard. Is there anything new you would like to tell us from the Commission's viewpoint? Well, I think just to elaborate on the infringement theory here, it's not an intended – the claims don't cover an intended use. I think that BioRAD alleged there are some inputs on the chips, but it wasn't clear. To confirm that the input is actually a sample well, as opposed to some other kind of well, they relied on the use of a sample with it to confirm that structure. Well, if they don't cover intended use, then why does it matter what the composition of the sample is? Because a sample well is a particular structure, right? It's not just any well. The chip GB is a very different device. But it's not disputed, is it, that the structures are identical? I gather that the dispute was what was contained in the structure. Is that incorrect? So the – it is – Your position is it doesn't make any difference that the sample is mixed with something else. Well, that was – that's the – well, that's the – the infringement theory was that the sample – the monomer solution confirmed that it was a sample well. So the problem that BioRAD has is the monomer solution isn't a sample in the context of the claims for the patent. The monomer solution is an input for a reagent production process, and that's what the ALJ found. It's not a sample. And that finding is supported by substantial evidence, but Drs. Hinson and Santiago testified to that. Dr. Hinson testified that a sample is something that the customer cares about and can and wants to analyze. He said there's no value in analyzing the monomers here. The definition of sample – it includes terms like of context or of interest, but that needs to be construed in – that needs to be applied in the context of the patent. In the patent, that's about figuring out what or how much of an analyte is in a sample using the chip. Are there any other questions about the sample aspect of the appeal? Anything else? Anything new that you need to tell us? No. No. Okay. All right. Thank you, Mr. Trout. I was just asking about BioRAD's appeal. I do have something to add as far as the droplet generation region construction that was discussed. So the ALJ explicitly found the construction here to be waived. It was an independent reason presented for rejecting its construction. And whenever TANF petitioned the waiver finding to the commission, it needed to show that the ALJ made a mistake, and it didn't because it didn't show that the – it didn't show that there was an error in the waiver finding. It doesn't raise any – it doesn't contend any error with the waiver finding until its reply brief here. And as the court pointed out before, there's just no – there's no basis in the claim language at all to support its construction. They're relying on examples of specification, but they – but you can't import limitations from specification into the claims. And the specification, in fact, allows the channels to be branched or to have more than one inlet. And that's all I needed – that's all I wanted to add for that issue. So if there are any other questions – are there any other questions? Any more questions for Mr. Trout? No. No. Okay. Thank you. Then we'll hear rebuttal from Mr. Cannon. Are you here? Are you unmuted? Can you hear me, Your Honors? I hear you now, yes. I apologize. Yes, I wanted to start off with the question that was raised earlier about contributory and induced infringement. And BI-RAD agrees with the ITC that there is – there will be no difference to the outcome. There would still be a violation of Section 337 and infringement even if the ITC was wrong on it and correct on contributory infringement. And I also wanted to add to Mr. Trout's argument from the ITC about waiver because if we look at what the ALJ actually did and what the ALJ actually found – and that is on Appendix Site 692 – the ALJ specifically found that 10X had waived its claim construction position on droplet generation region. And in fact, the ALJ said – called it a, quote, sudden departure from its position in the joint claim construction chart. And then further on Appendix Site 693, the ALJ said, quote, the first problem with respondents' new, quote, extending from construction is that it deviates significantly from the construction it set forth in the joint claim construction chart. For this reason alone, pursuant to Ground Rule 1.14, respondents' new construction is waived. And that is the construction of droplet generation region. And it was incumbent upon 10X at that point to appeal that waiver decision to the commission. It did not do so. And it was also incumbent upon 10X to appeal that waiver decision to this court, which it did not do so. So, I think the waiver position is, as the ITC presented in its argument, it should have been appealed below. But even on the merits of droplet generation region, I believe Your Honors analyzed this very well in the questions to Mr. Groombridge, in that the droplet generation region is simply the intersection of two channels with a third channel as an outlet channel. One of the channels has to have sample-containing fluid. And there is no dispute that the fluid that reaches the intersection is sample-containing fluid in terms of it contains sample and it's a comprising claim. So, even on the merits, should this construction be reached, 10X is incorrect and is trying to import limitations into the construction. And then I would like to briefly address the indirect infringement issue. And, Your Honor, unlike the cases cited by 10X in its brief, here we actually had a trial on knowledge and intent. And the ALJ specifically took testimony and found it not credible from 10X about its knowledge and intent position. And the ALJ made very detailed findings in the ID, which was affirmed by the ITC, explaining why the testimony was not credible. So, it's very much like the Warsaw case that I believe Judge Dyke authored from 2016, which affirmed a jury verdict. So, we actually had a trial on the knowledge and intent portions for indirect infringement. So, unless Your Honors have any further questions on this issue, that summarizes BI-RAD's position on 10X's appeal. Okay. Anything else for Mr. Cannon? No. No. Okay. Thank you. And Mr. Groombridge, do you have some rebuttal on your cross-appeal? Thank you very much, Your Honor. I really just want to follow up on the inducement and contributory infringement point. And to be clear, perhaps further responding to Judge Dyke's question and to what Mr. Trode and Mr. Cannon said, certainly if the court were to reverse on inducement and on contributory infringement, there would still be a violation. The practical effect that I had in mind is that that may impact, given that there are these design-arounds, it may impact how easy or difficult it is to continue importing chips under procedures, for example, with a certification or some kind of proceeding to modify the exclusion order. And if that is my time up, I'm happy to stop. Otherwise, I can just respond to what Mr. Cannon said regarding the task force. All right. Take another minute or so to make sure we have the cross-appeal straight. Yes. And on the question of the factual findings, we are not challenging any factual findings regarding the credibility of Dr. Hindson. The point there is that those really don't relate to the subject matter of these patents. And that is a factual finding saying with respect to whether droplet generation technology was being used. But that isn't what 682 and 635 patents are about. They're about other things. And therefore, that factual finding simply doesn't bear on the question of whether there was the requisite state of mind for inducement of those patents. And with that, I am concluded unless the court has further questions. Any more questions for any of the counsel? No. No. Okay. Thank you. Thanks to all three of you. The case is taken under submission.